STATE of Minnesota, Respondent,

v.

**Dale LANDE, Appellant.**

**No. C5-82-1309.**

Supreme Court of Minnesota.

June 15, 1984.

---

C. Paul Jones, State Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Norman B. Coleman, Sp. Asst. Atty. Gen., Linda F. Close, Asst. Atty. Gen., St. Paul, Julius Gernes, Winona County Atty., Winona, for respondent.

TODD, Justice.

Defendant was found guilty by a district court jury of two counts of burglary, two counts of theft of more than $150, and two counts of receiving or concealing stolen property of more than $150, Minn.Stat. §§ 609.58, subd. 2(1)(a); 609.52, subds. 2(1) and 3(2); 609.53, subd. 1(1) (1982). The charges were based on two separate burglaries—one on October 16, 1981, and the other on October 30, 1981—of the Krysko Commons on the campus of Winona State University. The trial court sentenced defendant, who had a criminal history score of "six or more," to four concurrent terms of 41 months for the two burglary and two theft counts; the court did not adjudicate defendant guilty of the two other counts. Minn.Stat. §§ 609.035, 609.04, 609.585 (1982). On this appeal from judgment of conviction defendant seeks an outright reversal of his convictions on the ground that the evidence of his guilt was legally insuffi-

cient. Alternatively, he seeks a new trial on the ground that the trial court erred in denying a pretrial motion to suppress certain evidence on fourth amendment grounds and in admitting certain evidence indicating that defendant had a prior criminal record and that he was committing another crime when he was arrested on November 3. We affirm.

1. Defendant's first contention is that the evidence of his guilt was legally insufficient. The state's evidence indicated that the two burglaries were committed by the same person. A pry bar found on defendant's person when he was arrested connected him to the first burglary, and gloves and a bank bag found on his person connected him to the second one. Defendant's admissions to Winona police, who later questioned him, also connected him to the burglaries. Finally, *Spreigl* evidence, that defendant had burglary tools in his possession and was ready to commit a burglary when he was arrested, helped establish that defendant did not just receive the stolen coins and bank bag but that he actually committed the burglaries and took the property. We conclude that the evidence of his guilt was sufficient.

2. Defendant's next contention is that the trial court erred in denying his motion to suppress evidence obtained as a result of his arrest by LaCrosse, Wisconsin, police on November 3. Defendant argues that the LaCrosse police violated his fourth amendment rights in stopping, frisking, and arresting him. The record indicates that the police first spotted defendant in a residential area at 3:15 a.m., that he was wearing dark clothing (which made it difficult to see him in the dark), and that he was acting somewhat suspiciously under the circumstances (walking briskly, then running, then looking over his shoulder). When the officers approached him, defendant appeared to be surprised and "jumpy." One of the officers saw an obvious bulge in defendant's jacket. As the other officer asked defendant his name and what he was doing, this officer walked behind defendant and saw what appeared to be the handle of some pliers. The officer then reached around and, patting the front of defendant's jacket, felt a long hard object. After directing defendant to stand against the wall of a nearby house, the officer pulled the long hard object out and found that it was a large metal snippers approximately 16 inches long. From the right breast area he pulled a long screwdriver and a large combination hammer/nail puller. After arresting defendant for possession of burglary tools, the officers conducted a more thorough search that resulted in the discovery of other items, including items connecting defendant to the Winona burglaries.

Although the police apparently did not need articulable suspicion to approach defendant, *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983),[1] they

---

1. In *Royer*, two airport detectives approached the defendant, who fit the so-called "drug courier profile," and asked to see his airline ticket and his driver's license. The detectives then told him that they were narcotics investigators and that they suspected him of transporting narcotics, and they asked him to accompany them to a small room adjacent to the concourse. Without Royer's consent, one of the detectives got Royer's luggage and brought it to the room. While not verbally responding to the request that he consent to a search of the luggage, Royer produced a key and unlocked one of the suitcases, which contained marijuana. Royer said that he did not object to the opening of the other suitcase but that he did not have a key. An officer pried that open and found more marijuana. The United States Supreme Court, by a 5 to 4 vote, affirmed the reversal of Royer's conviction. Justice White, in an opinion joined by Justices Marshall, Powell, and Stevens, stated, in relevant part:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations omitted.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation omitted.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on

arguably had it, given the totality of the circumstances (including the time, the place, defendant's manner of dress, and his suspicious behavior), *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Additional facts observed after the officers approached defendant (defendant's nervousness, the bulge in his jacket, and the handle of the pliers), when considered in connection with the other facts, justified the initial limited frisk of defendant. The discovery of the snippers in turn justified what followed. In summary, we hold that the police did not violate defendant's fourth amendment rights.

3. Defendant's third contention is that the trial court erred in admitting evidence that defendant possessed burglary tools and was about to commit a burglary when the LaCrosse police stopped him. Defendant contends that this evidence was inadmissible primarily because the Wisconsin authorities had dismissed the Wisconsin charges based on this conduct. We hold that the fact that Wisconsin authorities decided to dismiss the charge of possession of burglary tools did not prevent the Minnesota prosecutor from using the evidence to bolster the evidence that defendant committed the two Minnesota burglaries. Cases supporting this holding include *State v. Schantzen,* 316 N.W.2d 20 (Minn.1982); *State v. Almengor,* 310 N.W.2d 554 (Minn. 1981); *State v. Walker,* 310 N.W.2d 89 (Minn.1981). As these cases make clear, unless the defendant was acquitted of the other crime, evidence of the other crime may be admitted against the defendant— assuming it is relevant and assuming the potential of the evidence for unfair prejudice does not outweigh its probative value—if the evidence connecting defendant to the commission of the crime is clear and convincing. In making this assessment, the court must look at the evidence of the other crime in the context of the whole case.

In this case the evidence that defendant in fact possessed burglary tools when he was arrested and that he had been planning to commit a burglary was clear and convincing, and the evidence was relevant in several ways: (a) the pry bar found on

his way. [Citations omitted.] * * * He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation omitted.] If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

103 S.Ct. at 1324. Applying those principles to the case before him, Justice White reasoned: Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed he was not free to leave." [Citation omitted.]

103 S.Ct. at 1326. Justice White concluded that the detectives had adequate grounds for suspecting Royer of carrying drugs and for detaining him but that the detectives, by taking Royer to the small room, exceeded the bounds of an investigative detention and in effect placed Royer under arrest and that, there being no probable cause, the consent obtained from Royer was thereby tainted. 103 S.Ct. at 1326–1329.

Justice Brennan, concurring in the result, stated, *inter alia,* that it was unnecessary to decide the issue of the legality of the initial stop. 103 S.Ct. at 1330. He stated that in his opinion Royer was "seized" for fourth amendment purposes when the detectives asked him to produce his driver's license and airline ticket. 103 S.Ct. at 1331. He concluded that that seizure was unjustified and illegal.

Justice Blackmun, dissenting, agreed that at some point Royer was seized but disagreed with the conclusion that the police needed probable cause to take the actions that led to Royer's giving consent to the search of his luggage. 103 S.Ct. at 1332–1333. Justice Rehnquist, in a dissenting opinion joined by Chief Justice Burger and Justice O'Connor, agreed with the plurality's conclusion that no seizure occurred when the detectives first approached and questioned Royer. 103 S.Ct. at 1337 n.3. He stated that he disagreed with the plurality's assessment of the propriety of the detectives' conduct following their initial conversation with Royer. 103 S.Ct. at 1339–1340. He argued that the length and nature of the detention of Royer were justified by the suspicions that the detectives articulated. 103 S.Ct. at 1341.

defendant was used in committing the first burglary, (b) the gloves and the bank bag connected defendant to the second burglary, and (c) the evidence that defendant had been planning to commit a burglary tended to establish that, contrary to what he said, he was guilty not just of receiving property taken in the burglaries but also of committing the burglaries.

4. Defendant's final contention is that the fact that one of the witnesses in the chain of custody of the property seized at the time of his arrest was a probation officer improperly suggested to the jury that defendant was on probation at the time and that therefore he had a prior record. This issue is without merit. Although the probation officer in question apparently was defendant's probation officer, the jury was never told that fact and it is unlikely that the jury concluded that she was defendant's agent or that defendant had a prior record. Further, defense counsel, who presumably knew in advance that the probation officer was going to be a foundational witness, did not object to the evidence or ask that she not give her job title.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.